# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

ROBERT A.C. MURPHY,         )
                                    )

               Petitioner,      )
                                    )

               v.                 )        Cause No. 3:16-CV-606-PPS-MGG
                                    )

                                    )

SUPERINTENDENT,         )
                                    )

              Respondent.     )

## OPINION AND ORDER

Robert A. C. Murphy, a prisoner without a lawyer, seeks habeas corpus relief from his conviction at a bench trial for murder for which he was sentenced to sixty-five years of incarceration. In deciding this petition, I must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Here's how the Court of Appeals of Indiana summarized the evidence presented at trial:

> In late February or early March of 2009, Jason Osborne (Osborne) and Jennifer Stafford (Stafford) were in a relationship. They rented a trailer together in Muncie, Indiana. Osborne met Murphy when Murphy was looking for work. They started talking and eventually began spending time together. Both Osborne and Murphy bought their drugs from Jeffrey Allen (Allen).

> Stafford owned a Wii game system and a Play Station 2, which were both kept in the trailer. Murphy indicated to Osborne that he wanted the Wii and told Osborne that he could buy it from him and "make it look like a

1

robbery." Osborne declined. However, unbeknownst to Stafford, Osborne sold some of her Wii and Play Station 2 games and used the money to purchase cocaine. Over time, Osborne incurred a thirty dollar drug debt with Allen. Stafford did not know about the drug purchases or the debt.

From March 15 to March 21, 2009, Osborne was living at his mother's home in Baltimore, Ohio, and working for his uncle and cousin. During this time, Murphy contacted Osborne inquiring about the money to pay off the drug debt. Osborne promised to get him the money that weekend. On March 18, 2009, Murphy left a voicemail for Osborne's mother and father respectively indicating that Osborne owed money and that Murphy was stuck with it. Believing that he and Murphy had made plans by phone to make the payment, Osborne asked Stafford to wire him some money. It was Osborne's plan to give Murphy the money because he did not know how to reach Allen.

That same night, March 18, 2009 at around 7:55 p.m., Stafford spoke on the phone with her mother, Deborah Stafford (Deborah). She told Deborah that Murphy was at her trailer looking for Osborne because of the money owed and was playing with the Wii system. This was Deborah's last conversation with her daughter. Even though she attempted to reach Stafford the next day, she never received an answer. That same night, Stafford's brother, Clyde Stafford, Jr. (Clyde), also called Stafford's residence. He spoke with Murphy who wanted to know how to reach Osborne, and Clyde informed Murphy that Osborne was in Ohio. When the receiver was returned to Stafford, Clyde asked her to call him later that night to ensure that she was all right. She never contacted him.

Later that evening and early the next morning, Stafford made money withdrawals from two different banks. Both times, the transactions were recorded. Sometime after 1 a.m., Stafford, together with Murphy, drove to the Speedway Gas Station in her car, a Grand Am, to send a money gram for sixty dollars to Osborne. She was upset and was crying. Osborne received the money gram at approximately 4:30 a.m. in Ohio.

The morning of March 19, 2009, Murphy returned to the residence where he was living with his fiancée and her family, including her son, Kenneth Watson (Watson). While Watson was in the shower, Murphy asked to borrow his car. It was the first time Murphy had made such a request, and he did not say why he needed the car or where he was going. Watson called Murphy later that day, asking him to return the vehicle as he

needed his car. Even later, Murphy contacted Watson asking him for a ride to pick up another car. When Watson saw Murphy, he was upset and crying and was speaking with his pastor. Murphy was in possession of a Play Station 2 game, which Watson thought belonged to his younger brother, so Watson took it and put it in his brother's room. When Watson took Murphy to the other car, he noticed that it was Stafford's Grand Am. Murphy entered Stafford's car and sped away. Watson did not see Murphy again until Murphy returned to the residence that Murphy shared with his fiancée and her family. Murphy parked the Grand Am behind the home and packed his belongings in the vehicle. He informed Watson he was taking the car to a "chop shop" and driving to Michigan.

Later on March 19, 2009, Murphy spoke with Allen by phone. He told Allen that he had a Wii game system for sale and would bring it to Allen's residence, who was on house arrest. Murphy sold Allen the Wii for fifty dollars, with a thirty dollar down payment. It was later determined that the Wii belonged to Stafford.

Meanwhile, Stafford had failed to show for work on the morning of March 19, 2009. At 8 a.m., Stafford's employer called her home and cell phone lines but received no reply. Other employees also unsuccessfully tried to contact Stafford. The next morning, March 20, 2009, Stafford again failed to show for work and Stafford's employer contacted Stafford's mother. That same morning, Stafford's parents went to Stafford's trailer. When they arrived, they saw that Stafford's car was not in the driveway. Upon entering the trailer, they noticed several items missing: the Wii game system, the Play Station 2; the shower curtain, and a candle holder from the table in the front room. Walking into Stafford's bedroom, they saw blood all over the wall and Stafford laying on her bed with her head smashed in. There was no sign of a forced entry and there were no broken windows. Stafford's parents called 911.

During the ensuing police investigation, police officers contacted Osborne in Ohio who advised them that he believed Murphy had murdered Stafford. Osborne returned to Muncie to show the officers where they might find Murphy and Allen. When the officers talked with Allen, Allen provided them with the Wii game system while admitting that he thought it was stolen. The officers also retrieved the Play Station 2 from Watson. In the meantime, police officers in Michigan retrieved Stafford's car. The

contents of the car were missing, all that remained was dirt and traces of blood, as revealed by the officers' use of luminol.

The police officers took samples for DNA testing and blood evidence from Stafford's home and car. Sergeant Rodney Frazier with the Muncie Police Department (Officer Frazier) found blood traces in Stafford's bedroom consistent with blood dispersed through forceful impact upon Stafford, onto another surface, indicative of multiple blows inflicted. The patterns were also consistent in shape and size with an exact replica of Stafford's candleholder. No fingerprints or DNA evidence of Murphy was found. Linda McDonald (McDonald), a DNA analyst with the Indiana State Police DNA Unit, explained that "Stafford's blood overwhelmed just about everything I tested." Pathologist Dr. Paul Mellen (Dr. Mellen) opined that Stafford had suffered more than twenty blunt force injuries caused with a heavy, blunt instrument consistent with the candlestick holder from Stafford's home. He concluded Stafford's manner of death to be homicide.

On March 21, 2009, Murphy turned himself in to the Muncie Police Department. Officers James Johnson (Officer Johnson) and Al Williams (Officer Williams) led Murphy's interrogation. After having advised Murphy of his Miranda rights, the officers verified that Murphy understood these rights. Initially interrogating Murphy about his personal information, the officers turned the conversation to Stafford and her death. At that point, Murphy asked to "get an attorney here because this is about to get real deep." The officers replied that they would "stop talking then" and asked him if he had an attorney. Murphy denied having an attorney nor could he provide the officers with the name of an attorney he wanted to talk to. Upon stopping the interview, the officers placed Murphy in a holding cell until they could process the appropriate paperwork to arrest him. They told him that he would be charged with Stafford's murder.

While they were drafting the paperwork, Murphy banged on the wall between the holding cell and the officers' office. When the officers entered the holding area, they informed Murphy that they could not talk to him because he had requested an attorney. However, Murphy indicated that he wanted to resume talking. Officer Williams advised Murphy that his Miranda rights still applied; the officers then resumed the interview. Later, during the interview, Murphy admitted to beating Stafford.

*Murphy v. State*, 941 N.E.2d 568 (Ind. Ct. App. 2011); ECF 9-5 at 4-8.

Murphy argues that he is entitled to habeas corpus relief, alleging that the trial court erred by denying the motion to suppress his confession and by convicting him based on insufficient evidence. He also alleges that he was denied effective assistance of counsel when trial counsel failed to object to the charge of murder; and when appellate counsel failed to raise the exculpatory value of the DNA evidence; failed to raise the exculpatory value of eyewitness testimony that another individual was seen near the victim's house; and failed to withdraw even though appellate counsel had a life-threatening illness; and when the trial court allowed only one defense attorney to question witnesses. He further alleges that his due process rights were violated when the prosecution failed to turn over cell phone information and introduced perjured testimony; and when the post-conviction relief appellate court denied a motion to stay, which deprived him of the complete record.

The first issue to consider is whether Murphy has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). I can't get to the merits of the petition unless Murphy has fully and fairly presented his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006)

(citing *Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id.*

Murphy presented his claims that the trial court erred by denying the motion to suppress his confession and by convicting him based on insufficient evidence to the Indiana Supreme Court and Court of Appeals of Indiana on direct appeal. ECF 9-3 at 23-27; ECF 9-6. He also presented his claim that appellate counsel failed to raise the exculpatory value of the DNA evidence to the Indiana Supreme Court and the Court of Appeals of Indiana at the post-conviction relief stage. ECF 9-9 at 19; ECF 9-13 at 11. So I will consider the merits of these claims.

But Murphy did not fully and fairly present the remaining claims to the Indiana courts. He presented to the Indiana Supreme Court his objection to the Court of Appeals' denial of a motion to stay. ECF 9-13 at 12-13. But this is an error — if it is an error at all — of state procedural matters having nothing to do with the federal constitution. It is only when "errors in state collateral review . . . violates some other constitutional right" that the habeas mechanism can come into play. *Jackson v.*

*Duckworth*, 112 F.3d 878, 880 (7th Cir. 1997); *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir. 1996). So Murphy's claim regarding the denial of the stay is not a cognizable habeas claim.[1] Additionally, he did not present to the Indiana Supreme Court his claims of prosecutorial misconduct or his claim that trial counsel failed to object to the murder charge. ECF 9-13.

Further, Murphy did not present to the Court of Appeals his claim that his appellate counsel was ineffective for failing to raise the exculpatory value of eyewitness testimony that another individual was seen near the victim's house; or his claim that he was deprived of his right to counsel when the trial court allowed only one defense attorney to question witnesses. ECF 9-9. He presented his claim that his appellate counsel should have withdrawn due to illness to the Court of Appeals, but only in a reply brief. ECF 9-11 at 13. Under Indiana law, "a party that raises an argument for the first time in its reply brief waives the argument on appeal." *Bd. of Works of City of Lake Station v. I.A.E., Inc.*, 956 N.E.2d 86, 95 (Ind. Ct. App. 2011); Ind. R. App. 46(c). Because he did not fully and fairly present these claims through one full round of state court review, they are procedurally defaulted.

A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice from that failure.

---

[1]Moreover, Murphy requested the stay to obtain the trial stipulation for the lab findings of Serafina Salmo, the State serologist, and a pro se motion for DNA testing filed at the post-conviction relief stage. ECF 1 at 5. These documents were not material to Murphy's claims on appeal during the post-conviction relief stage. *See* ECF 9-9.

*Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 2382 (2009). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense" which prevented a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier*, 477 U.S. 478, 492 (1986).

To excuse procedural bar, Murphy asserts that he did not have counsel during the post-conviction relief stage. As a general rule, "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as cause." *Maples v. Thomas*, 565 U.S. 266, 280 (2012). However, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Brown v. Brown*, 847 F.3d 502 (7th Cir. 2017). Sensibly, for purposes of the *Martinez* exception, "inadequate assistance of counsel" includes having no counsel at all. *Id.* at 14.

Two of Murphy's claims arguably constitute ineffective assistance of trial counsel claims: his claim that trial counsel failed to object to the charge of murder and that he was deprived of counsel when the trial court allowed only one defense attorney to question witnesses. "[A] prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. 1, 14

(2012). I will assume without deciding that these two claims have some merit and will consider the claims.[2]

## Standard of Review

Federal habeas review serves as an important error-correction tool to help ensure the proper functioning of the criminal justice system. But the available relief is very limited. "Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted). Habeas relief can only be granted in one of two ways: if it is shown that the adjudication of the claim by the state court resulted "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or if the state court decision was based "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

This is a demanding standard that has been described by the Supreme Court as follows: "[This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings . . . of this Court's decisions. And an unreasonable application of those holdings must be

---

[2] Notably, federal courts have the discretion to consider claims for habeas relief under certain circumstances even if such claims are procedurally barred. 28 U.S.C. § 2254(b)(2).

objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods*, 135 S.Ct. at 1376 (quotation marks and citations omitted). In other words, to obtain relief, the state court's ruling must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

With these standards in mind I will turn to the various claims for relief asserted by Mr. Murphy.

## Discussion

*Admissibility of the Confession*

Murphy argues that the State court made an objectively unreasonable decision to deny his motion to suppress his confession. In that motion, Murphy argued that the police officers violated his Fifth Amendment right to remain silent by continuing to question him after he requested an attorney. Direct Appeal App. 325-34. He also argued

that the police induced the confession by threatening to arrest his children and that the admission of the confession at trial violated his Due Process rights. *Id.*

To protect an individual's right against self-incrimination, an individual must be warned prior to a custodial interrogation that he has the right to remain silent and that any statement he makes may be used against him. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). When the prosecution alleges that an individual waived the protections afforded by *Miranda*, the central inquiry is whether the defendant knowingly and voluntarily waived his rights. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). "The waiver inquiry 'has two distinct dimensions':  waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010).

The Due Process analysis for the voluntariness of confessions is "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000). "The due process test takes into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* "A confession is voluntary if, considering the totality of the circumstances, it is the product of a rational intellect and free will, and not the result of physical abuse, psychological intimidation,

or deceptive interrogation tactics that have overcome the defendant's free will." *Pole v. Randolph*, 570 F.3d 922, 941 (7th Cir. 2009). "Courts may consider, among other things, the age, experience, education, background and intelligence of the accused, the length of the questioning, and other circumstances surrounding the interrogation when evaluating whether a confession was voluntarily given." *Id.*

At the evidentiary hearing on the motion to suppress, the trial court heard the testimony of the officers who obtained the confession and considered the confession transcript and the written statements from Murphy's son and his son's girlfriend. Trial Tr. 61-249. According to the record, Murphy went to the police station to turn himself in, and he was accompanied by his son and his son's girlfriend. *Id.* at 68-70. He was then interviewed by Lieutenant Al Williams and Investigator James Johnson, who advised Murphy of his *Miranda* rights and obtained a signed waiver. *Id.* at 78-81. Shortly thereafter, Murphy asked for an attorney. *Id.* at 88-91. Williams and Johnson stopped the interview and moved Murphy to a holding cell. *Id.* As they prepared paperwork, they heard Murphy banging on the cell door. *Id.* Murphy asked what his charges would be, and they told him that he was under arrest for murder. *Id.* He then told them that he wanted to continue talking to them despite his earlier request for an attorney. *Id.* Williams and Johnson continued the interview after confirming that Murphy's participation in the interview was voluntary and again reminding Murphy of his *Miranda* rights. *Id.*

Murphy then described his version of the events, which included admitting that he struck the victim with a large glass object in her home and stole her video games and that he was attempting to collect a debt owed by the victim's boyfriend. Hearing Ex. 2 at 14-89. He also indicated that, after he left the victim's house in Muncie, he got a ride to Fort Wayne, where his son picked him up and took him to Michigan. *Id.* at 41-42. As the interview continued, Williams and Johnson apparently detected a discrepancy in Murphy's statements on what happened with the victim's car. *Id.* at 92-93. They told Murphy that they would question his son about his story and that, if his son lied, his son could be charged with obstruction of justice. *Id.* at 94. Later, Murphy asked where his son was at, and Williams told him that his son was being questioned but was not in trouble and again told Murphy that his son's lying would constitute a felony. *Id.* at 118-20.

As Williams and Johnson questioned Murphy, Investigator Melissa Pease obtained statements from Murphy's son and his son's girlfriend. Trial Tr. 201-04. Murphy's son corroborated Murphy's version of the events by stating that he picked Murphy up in Fort Wayne. Hearing Ex. 7. However, the girlfriend stated that she and Murphy's son met with Murphy in Flint, Michigan, rather than Fort Wayne and that Murphy had coached them to say that they had picked him up from Fort Wayne. Hearing Ex. 5. After obtaining these statements, Pease joined Williams and Johnson and

presented these statements to Murphy, who then agreed to provide more information regarding the location of the victim's vehicle. Hearing Ex. 2 at 155-161.

The Court of Appeals of Indiana concluded that there was no *Miranda* violation, finding that Williams and Johnson stopped the interview when Murphy asked for an attorney; that they continued the interview at Murphy's request, and that Murphy was aware of his rights when the interview resumed. ECF 9-5 at 12-13. The appellate court further concluded Murphy confessed voluntarily because the officers' statements regarding Murphy's son did not constitute a threat, emphasizing that they informed Murphy that his son was not in trouble and correctly advised Murphy regarding the legal risks to his son. *Id.*

After reviewing the record, I cannot find that the appellate court's determination that there was no *Miranda* violation was objectively unreasonable. Notably, Murphy did not introduce evidence at the suppression hearing to contradict the officers' version of events, and the officers' testimony provides ample support to find that Murphy knowingly and voluntarily waived his rights. Additionally, the appellate court's conclusion that Murphy's confession was voluntary was also not unreasonable. Murphy went to the police station to turn himself in on his own accord, and he waived his *Miranda* rights on two separate occasions. It is true that at some point Murphy invoked his rights under *Miranda*. But it is permissible for law enforcement officers to continue an interview of a subject who previously invoked his rights under *Miranda* provided that it is the defendant who reinitiates the conversation. *United States v. Hampton*, 675

14

F.3d 720, 727-28 (7th Cir. 2012). And that's what happened here. When Murphy started banging on his cell door and telling the officers he wanted to talk, they were within their rights to continue the interview with him.

What's more, Murphy knew the ropes; he had been subjected to custodial interrogation and criminal proceedings on at least one other occasion, and the officers provided Murphy with cigarettes, water, food, and time to collect himself upon request. Moreover, by the time the officers' mentioned Murphy's son, Murphy had already confessed to striking the victim with glass objects in her home in an attempt to collect a debt and stealing her video games. Considering the totality of the circumstances, I cannot find that the appellate court's determination that the confession was voluntary was objectively unreasonable. Therefore, Murphy's claim regarding the admission of his confession is not a basis for habeas relief.

*One Counsel Rule*

Murphy argues that he was deprived of his right to counsel when the trial court allowed only one defense attorney to question witnesses. He argues that, as a result, his attorney L. Ross Rowland did not speak at trial, which denied him the assistance of counsel. Because no State court has addressed this claim, I will review this claim de novo. *See Thomas v. Clements*, 789 F.3d 760, 767 (7th Cir. 2015). At the suppression hearing, the trial court instructed all counsel, two prosecutors and two defense attorneys, to limit questioning of witnesses to one attorney per side but also encouraged

the attorneys on each side to confer prior to questioning. Trial Tr. 134. To Murphy's point, Rowland did not question any witnesses during the bench trial.

For this claim, Murphy relies on *Herring v. New York*, 422 U.S. 853, 857 (1975), which holds that the right to assistance of counsel included the right to make closing arguments even in bench trials. *Id.* at 865. Similarly, the right to assistance of counsel likely includes the right to have witnesses questioned by counsel. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). Though the Constitution prohibits "restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process," *Herring*, 422 U.S. at 857, courts retain the discretion to place reasonable limits on how such functions are executed. *Id.* at 862; *Delaware*, 475 U.S. at 679. Here, Murphy was not deprived of his right to have witnesses questioned by counsel. Rather, Murphy's defense team had the opportunity to question each witness, and Murphy's other defense attorney, John H. Brooke, did so throughout the bench trial. Further, Murphy has not shown how the trial court's limitation was unreasonable, nor has he shown any prejudice. Therefore, I find that Murphy's claim that the trial court's instruction to defense counsel deprived him of assistance of counsel is not a basis for habeas relief.9425198435893

### Sufficiency of the Evidence

Mr. Murphy's remaining claims are that his conviction was not supported by sufficient evidence and that appellate counsel failed to raise the exculpatory value of

16

DNA evidence. These claims are related as they focus on the absence of DNA or fingerprint evidence linking Murphy to the scene of the murder. For sufficiency of the evidence claims, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

To prevail on an ineffective assistance of counsel claim, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S.

86, 112 (2011). The *Strickland* analysis also applies to ineffective assistance of appellate counsel claims. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

At trial, Murphy was charged with murder and felony murder. Trial Tr. 281. The prosecution introduced evidence to show that Murphy and the victim were together until at least 2:20 a.m. on the morning of March 19, 2009, the date of the murder. *Id.* at 771-80. This evidence consisted of testimony from the victim's family, bank records, and video surveillance from local businesses. *Id.* at 463-64, 548-53, 739-80. Dr. Paul Mellon, who performed the autopsy, testified that the victim died due to suffering more than twenty blunt force injuries to the head and neck. *Id.* at 572-77. The victim's parents testified that they noticed that the victim's Playstation 2, Nintendo Wii, car, and a glass candlestick holder were missing from the victim's residence. *Id.* at 467-68, 478-79. Kenneth Watson, Murphy's girlfriend's son, testified that he saw Murphy with a Playstation 2 later on the same morning; he also saw Murphy in the victim's car. *Id.* at 620, 626. Bradley Weimer, a police officer, testified that he found the victim's car eight minutes away from Murphy's mother's residence in Flint, Michigan. *Id.* at 813-20. Similarly, Jeffrey Allen, an associate of Murphy, testified that Murphy sold him a Nintendo Wii also on that morning. *Id.* at 905-21. The evidence also demonstrated that Murphy had previously tried to steal and sell the victim's Nintendo Wii and was concerned about money on the date of the murder. *Id.* at 352-55, 435-40, 442-49, 463, 549. The trial court also considered Murphy's confession in which he admitted to being with the victim on the morning of the murder; to hitting the victim with a large glass object;

and to taking the video games, the car, and the large glass object from the victim's residence. Trial Ex. 87.

Linda McDonald, a DNA analyst, testified that Murphy's DNA was not found on the crime scene but that she detected the DNA of an unknown individual. *Id.* at 846-47. She also testified that the overwhelming presence of the victim's blood made it difficult for her to detect any other DNA. *Id.* at 845. Rodney Frasier, an evidence technician, testified that he was unable to detect Murphy's fingerprints at the crime scene. *Id.* at 1017-20. Melinda Hargis, a neighbor of the victim, testified that she observed a suspicious Caucasian man at the victim's residence on the evening of March 19, 2009. *Id.* at 1109-14. Notwithstanding these shortcomings in the evidence, the trial court found sufficient evidence to support both counts but entered judgment only on the count of murder. *Id.* at 1215-17.

On direct appeal, Murphy, through appellate counsel, argued that the trial court had insufficient evidence for the murder conviction because Murphy's DNA and fingerprints were not found at the victim's residence. ECF 9-3 at 26-27. The Court of Appeals of Indiana found that the evidence demonstrated that Murphy was with the victim on the date of the murder, struck the victim, and had possession of the victim's property immediately after the murder. ECF 9-5 at 13-14. The appellate court concluded that the evidence was sufficient to support the murder conviction even in the absence of any incriminating DNA or fingerprints. *Id.*

On appeal at the post-conviction relief stage, Murphy argued that his trial counsel and appellate counsel[3] were ineffective for failing to raise the exculpatory value of the DNA evidence. ECF 9-9 at 27-28. Though the Court of Appeals of Indiana did not address the arguments regarding appellate counsel, it found no deficient performance for trial counsel because trial counsel, in fact, raised the absence of incriminating DNA. ECF 9-12 at 6-7.

After reviewing the record, I cannot conclude that the State court's determination that there was sufficient evidence to support the conviction of murder was objectively unreasonable. The medical evidence regarding the nature of the victim's death provides ample evidence that her killing was intentional. There is overwhelming evidence that Murphy had the opportunity to commit the murder and also evidence showing that Murphy had a financial motive to do so. Additionally, Murphy confessed that he assaulted the victim with the glass candlestick holder at her residence on the date of the murder. Moreover, appellate counsel expressly raised the lack of DNA evidence on direct appeal. Therefore, Murphy's claims that his conviction was not supported by sufficient evidence and that appellate counsel failed to raise the exculpatory value of DNA evidence are not a basis for habeas relief.

*Murder Charge*

---

[3]At trial and on direct appeal, John H. Brooke and L. Ross Rowland from the Public Defender Office represented Murphy. PCR Tr. 71-72.

Murphy also argues that trial counsel failed to object to the charge of murder on the basis of insufficient evidence because he was never charged or convicted of robbery. However, the State is not required to prove robbery for a murder conviction. *See* Ind. Code § 35-42-1-1(1) ("A person who knowingly or intentionally kills another human being commits murder"). Murphy may be referring to the charge of felony murder, but because the trial court entered judgment only on the count of murder, he suffered no prejudice from the charge of felony murder. Moreover, Indiana law would not have required the prosecution to charge or convict Murphy with robbery in order to obtain a felony murder conviction. *Douglass v. State*, 466 N.E.2d 721, 722 (Ind. 1984) ("[C]harging a person with felony murder also, in effect, necessarily charges him with the underlying felony. In terms of its legal effect, a separate underlying felony count adds nothing to the case.). Therefore, Murphy's claim that trial counsel failed to object to the murder charge is not a basis for habeas relief.

## Certificate of Appealability

Pursuant to Section 2254 Habeas Corpus Rule 11, I must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v.*

*McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this opinion for denying habeas corpus relief, there is no basis for encouraging Murphy to proceed further. For the same reasons, he may not appeal *in forma pauperis* because an appeal could not be taken in good faith.

ACCORDINGLY:

The Court **DENIES** the habeas corpus petition; **DENIES** a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; **DENIES** leave to appeal *in forma pauperis*; and **DIRECTS** the Clerk to enter judgment in favor of the Respondent and against the Petitioner.

**SO ORDERED** on April 17, 2018.

s/ Philip P. Simon
Judge
United States District Court